30761. GIBSON v. THE STATE.

UNDERCOFLER, Presiding Justice.

The appellant, Samuel Gibson, III, was indicted by the Jones County Grand Jury for murder and rape occurring on April 10, 1975. Following a trial by jury from May 12, 1975, to May 14, 1975, the appellant was convicted and sentenced to death on both counts. The case is here on appeal and for review of the death sentences imposed.

I. Summary of the Evidence

The deceased victim, Joan Delight Bryan, was married to Mr. Thomas Bryan. They lived in a farmhouse in Gray, Georgia, with four-year-old Stacy Nadine White,

the daughter of the deceased from a previous marriage.

On the morning of April 10, 1975, Mr. Bryan went to work in Milledgeville, Georgia, as usual. Mrs. Bryan and Stacy stayed at the farmhouse where Mrs. Bryan was in charge of renting some trailers located near the farmhouse.

In the early afternoon some ten or more miles away, the appellant was walking in the rain toward Wayside, Georgia. Several persons encountered the appellant as he walked and some of them positively identified him and noted the long dark coat he was wearing that extended below his knees.

The appellant arrived at the farmhouse and knocked on the door. When Mrs. Bryan, the victim, answered the door, the appellant indicated that he wanted to look at some trailers. She showed the appellant the trailers and told him the rental charge. Subsequently, the appellant asked the deceased for a glass of water and she let him into the living room.

The appellant then approached the victim sexually by "brushing against" her breast. He ended up shooting her in the head in the presence of her four-year-old child. He also had sexual intercourse with her despite her resistance which is evident and committed sodomy on her. Whether these sexual acts occurred before or after the victim was fatally shot is in conflict but there is no conflict concerning their occurrence.

Dr. James Dawson came to examine the victim's body. He first noticed that there was a considerable amount of blood in the general vicinity of the body. He also noticed some blood spots on the bed in the room where the deceased was found and there was also a bullet hole in the wall above the bed. There was some lividity on the body indicating that the victim was in the position in which it was found at the time blood circulation stopped.

The victim had received three wounds to the head. Two were lacerations, one located in the back of the head which almost penetrated the entire thickness of the scalp. The second laceration was similar to the first. The third wound was a gunshot wound by a .32 caliber bullet which entered the right side of the head and traveled leftward and downward, lodging in the general area of the left ear.

This wound caused her death.

There were also wounds on the right hand and arm that were probably caused by a bullet because particles of lead were found in the wounds. There were also injuries to the victim's vagina and anus, at least the latter of which was damaged while her heart was still beating.

Plaster casts of shoe prints in the road in front of the Bryans' home established that the shoe prints matched some shoes of the appellant. Appellant's foster mother had a .32 caliber pistol that the appellant had used and had access to. A cleanser can appellant said he took from the Bryan's home along with a towel was found where the appellant said he had thrown it away.

The appellant admitted to his grandfather that he killed Mrs. Bryan but said it was an accident.

Dr. James Dawson testified to his belief that the lacerations in the deceased's head were inflicted before the gunshot, but there was no way to be certain. The testimony of Dr. Dawson further showed that although brain tissue was present in the hair of the deceased none was found on the bed in the room where she died.

Tests on the body showed strong indications of the presence of seminal fluid in the anus and vagina of the deceased. The blanket from a bed in the Bryans' home was found to contain seminal fluid.

Appellant's pre-trial statement to officers was substantially the same as his testimony. He testified as follows. He had decided to move from his foster mother's home. He knew where some trailers were being rented and decided to go there to rent one. Since he knew he would be walking alone down a country road, he carried Joe Powell's .32 caliber pistol for protection. He arrived at the deceased's home safely and asked to see trailers.

After he (the appellant) saw the trailers he asked the deceased for a glass of water. She gave him some water and began talking with him. In the course of the conversation she mentioned she was in charge of the place because a certain Mr. Dewitt was in New York. At that time the appellant "grabbed her . . . kinda rubbed across her breasts."

The appellant further testified that the deceased became hysterical and tried to get a rifle from the mantel

in the living room near where they were standing. He pulled his gun out and prevented deceased from getting the rifle. The victim then turned and grabbed the appellant's gun. The gun fired once and the struggle continued. The gun fired again and the deceased sank to the floor of the living room. As the deceased fell, he (the appellant) asked her where she was hit and she answered "head."

The appellant testified that he then became frightened and decided to cover up his presence. "I tried to make it look like somebody raped her." He testified that he dragged the deceased by her arms into the back bedroom and laid the top part of her body on the bed and took her clothes off. He then had intercourse with her body and attempted anal intercourse.

On cross examination the appellant testified to the following: When he went out to see the trailers he did not have any money and did not have a job at the time; he said that he would earn the rent by playing pool, although he was not proficient at the game. When asked how he planned to transport himself back and forth to Gray, Georgia, a distance of about fifteen miles, he stated that he would walk and hitchhike. The appellant admitted that he slapped four-year-old Stacy as he left because she was crying.

## II. Enumerations of Error

1. In enumerations of error numbers 1, 2, 3, and 5, the appellant complains of the exclusion of several prospective jurors because of their opposition to the death penalty.

In *Owens v. State,* 233 Ga. 869 (214 SE2d 173) (1975) we said that Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), as amplified in Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433) (1968), and Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221) (1970) held that " 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' Witherspoon, supra, pp. 521-523. Such a venireman cannot be excluded unless he makes it

unmistakably clear that he would vote against the death penalty regardless of what transpires at trial, or that his attitude on the death penalty would prevent him from impartially passing on the issue of guilt, or that he could not subordinate his personal feelings on the death penalty to his oath as a juror to obey the law of the state as charged by the trial court." Each of the prospective jurors excused makes it unmistakably clear that he would vote against the death penalty regardless of what transpires at trial. See also *Eberheart v. State,* 232 Ga. 247 (206 SE2d 12) (1974).

These enumerations are without merit.

2. Enumerations of error numbers 11, 12, and 13 are argued together and will be considered together here.

Enumeration of error No. 11 contends that the court erred in charging the jury that they could find the death penalty on both cases, using the commission of the murder as the aggravating circumstance for the rape, and using the commission of the rape as the aggravating circumstance for the murder and in its recharge to the jury and in overruling his exceptions thereto.

Enumeration of error no. 12 contends that the court erred in receiving verdicts not in proper form, as to punishment inasmuch as the jury used each capital felony conviction as the aggravating circumstance for the other, and in allowing both death penalties to stand.

Enumeration of error no. 13 contends that the court erred in imposing the death penalty on each count.

In support of these enumerations the appellant directs all of his argument to the constitutionality of the Georgia death penalty statute that has been considered and upheld by this court in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974) and subsequent cases. No new matter is presented here that convinces us to reconsider that issue.

The thrust of these enumerations is that the imposition of two death sentences on the basis of mutually aggravating circumstances was not authorized in this case. This aspect of the case will be considered by this court on sentence review.

3. In enumerations of error nos. 14 and 15 the appellant contends that the court erred in overruling his challenge to the array of the grand and traverse juries

because they were not legally constituted.

The contentions remaining of both challenges are the same — that the composition of the jury lists in Jones County are illegally, unlawfully and unconstitutionally composed because there was a systematic, intentional and discriminatory exclusion of certain identifiable segments of the community which caused the jury lists to violate rights guaranteed by the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution and the Georgia Constitution, and also caused the jury lists to be violative of Ga. L. 1973, pp. 484, 485 (Code Ann. § 59-106) because such exclusion prevented those lists from being composed of a "fairly representative cross section of the intelligent and upright citizens of the county. . ." The groups alleged to be excluded were: (1) women; (2) negroes; and (3) young adults between 18 and 30 years of age.

In Georgia, the grand jury of a particular county is to be chosen from the registered voter list of that particular county. Code Ann. §§ 59-106, 59-201. The evidence presented here indicates that the Jones County jury commissioners complied with the statutory requirements.

The appellant must prove a prima facie case of unconstitutional discrimination to challenge the array of the grand jury successfully. White v. McHan, 386 F2d 817 (5th Cir.) (1967); In re Lollis, 291 FSupp. 615 (E.D. Tenn., 1968). See also Swain v. Alabama, 380 U. S. 202, 205 (1965); Taylor v. Louisiana, 419 U. S. 522 (1975); Whitus v. Georgia, 385 U. S. 545 (1966); Patton v. Mississippi, 332 U. S. 463 (1947); and Alexander v. Louisiana, 405 U. S. 625 (1972). The appellant presented evidence to show that the grand jury list was composed of 412 members. Of these, 357 (87.6 percent) were males and 55 (12.62 percent) were female. The Jones County population over 21 consisted of 47.19 percent males and 52.62 percent females. The appellant showed that 33.3 percent of the Jones County population was black but that 17.71 percent of the grand jury list was black. He also showed that persons between the ages of 18 and 20 comprised 7.3 percent of the population of Jones County.

In Estes v. State, 232 Ga. 703 (208 SE2d 806) (1974)

this court held that the exclusion of persons between 18 and 20 years of age from service on the grand jury does not violate the due process and equal protection rights of an accused under either the Georgia Constitution or the United States Constitution. We there said that Georgia Constitution 1945, Art. VI, Sec. XVI, Par. II, authorizes the General Assembly to "provide by law for the selection of the *most experienced* intelligent and upright men to serve as grand jurors." We held that language authorized the General Assembly to set the age for grand jury service at age 21. Therefore appellant's allegation that the grand jury array for Jones County is unconstitutional in that Code Ann. § 59-201 arbitrarily excludes persons between the ages of 18 and 20 years is without merit.

Another of the appellant's allegations is that Code Ann. § 59-201 is unconstitutional in that it arbitrarily excludes persons who have not lived in a particular county for more than six months. Appellant presented no evidence that there were any new residents (persons who were in Jones County for less than six months) at the time the grand jury list was composed, and has made no showing that he has been injured in any way by the application of Code Ann. § 59-201. The test as to whether a particular qualification is constitutional in selection of jury members is whether the conditions imposed are rationally related to a valid state purpose. See Turner v. Fouche, 396 U. S. 346 (1970). Residency, at least a minimum period of time in which to evaluate potential candidates for the jury, is related to the state's interest in determining who are upright and intelligent citizens.

In his challenge to the array of the grand jury, appellant alleges that Ga. L. 1967, p. 725 (Code Ann. § 59-112 (d)), is unconstitutional in that it violates Georgia Constitution Art. I, Sec. I, Pars. III and XV (Code Ann. §§ 2-103, 2-125) and the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. Code Ann. § 59-112 (d) was amended and became effective on April 18, 1975. Ga. L. 1975, p. 779. There is no longer a special exemption for women serving on juries. The exemption was eliminated April 18, 1975, and the appellant was tried on May 12, 1975, after

the special exemption had been eliminated. In any event the appellant's claim is not of constitutional magnitude. See *Maddox v. State,* 233 Ga. 874 (213 SE2d 654) (1975) distinguishing Taylor v. Louisiana, 419 U. S. 522 (95 SC 192, 42 LE2d 690) (1975).

The appellant has provided no evidence to support his allegation that the grand jury array of Jones County was improperly constituted because it purposely discriminated against poor people by failing to show the existence of any definable group of persons who would be considered poor. See Rodriguez v. San Antonio Independent School District, 411 U. S. 1, 19-21 (1972).

The makeup of the Jones County grand jury commissioners does not support the allegation that the panel is improperly constituted. The commissioners consist of two black persons, one white woman, and three white men. In the absence of some evidence from past panels of grand jury commissioners no pattern of purposeful discrimination can be said to appear. Akins v. Texas, 325 U. S. 398, 403 (1945); *White v. State,* 230 Ga. 327, 331 (196 SE2d 849) (1972).

The appellant's allegations concerning the grand jury and the supporting evidence therefore apply equally to the traverse jury.

In our review of the testimony of the jury commissioners the procedures followed were to use the voter's registration list as the basis for selection of jurors, that they attempted to select law-abiding, honest, upright citizens of the community, that some jurors were added to the traverse jury list that were not on the registered voters list, that some prospective jurors who were on the registered voters list were left off at their request, particularly women, that they chose from age 18 on up with no exclusions of whites, blacks, males, females, or youth, although some were not put on for old age or physical infirmities that would interfere with their service. Those with prior service on traverse juries were selected for the grand jury as being more experienced in accord with the statute.

In view of the foregoing we conclude that, the jury being composed of a representative cross section of the population of Jones County, the trial court did not err in

overruling the appellant's challenge to the array of the grand and traverse juries.

4. Appellant's other enumerations of error are either specifically abandoned or were not argued on appeal and are considered abandoned pursuant to Rule 18 (c) (2) of this court.

### III. Sentence Review

In our sentence review we have considered the aggravating circumstances found by the jury and the evidence concerning the crimes introduced in court.

We have reviewed the sentences as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537 (c) (1-3)), as we did in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974), and in each subsequent case involving the death penalty under this statute. We conclude that the sentences of death imposed here were not imposed under the influence of passion, prejudice, or any other arbitrary factor. In our view, the evidence supports the jury's findings of statutory aggravating circumstances as to both the murder and rape counts, viz., that the offenses of both murder and rape were committed while the offender was engaged in the commission of another capital felony. (Code Ann. § 27-2534.1 (b) (2)). Although under the test provided by statute for comparison (Code Ann. § 27-2537 (b) (3)) these two sentences of death are not excessive or disproportionate to the penalties imposed in similar cases, we held in *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974) that the actual imposition of two death sentences on the basis of mutually aggravating circumstances could not be upheld. (There we held that since two armed robberies were held to be the aggravating circumstances authorizing the death penalties as to the murders, the murders cannot then be used in aggravation of the two armed robberies.)

Therefore, as prescribed by the statute (Code Ann. § 27-2537 (c) (2)), the sentence of death for the rape offense must be set aside and the case remanded for resentencing by the trial judge on the rape count of the indictment, based upon the record and argument of counsel. The death sentence for the offense of murder is affirmed.

*Judgment affirmed with direction. All the Justices concur, except Gunter and Ingram, JJ., who dissent.*

SUBMITTED FEBRUARY 9, 1976 — DECIDED MAY 18, 1976.

*Charles Marchman, Jr.,* for appellant.
*Joseph H. Briley, District Attorney, Arthur K. Bolton, Attorney General, Isaac Byrd,* for appellee.

APPENDIX.

Similar cases considered by the court: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657) (1970); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970); *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1975); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Dobbs v. State,* 236 Ga. 427 (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Pulliam v. State,* 236 Ga. 460 (1976).

INGRAM, Justice, dissenting.
I dissent to the majority opinion primarily because of the jury composition issue. A review of the transcript and record leads me to the opinion that the requirements of Alexander v. Louisiana, 405 U. S. 625, 632 (1972), and Turner v. Fouche, 396 U. S. 346, 361 (1970) have not been satisfied in this case.